J-S23028-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 744 EDA 2025 |

Appeal from the Order Entered March 4, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000540-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 745 EDA 2025 |

Appeal from the Decree Entered March 4, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000227-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 746 EDA 2025 |

Appeal from the Order Entered March 4, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000564-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: N.H.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

:
:
:
APPEAL OF: M.B., MOTHER          :
:
:
:
:
:          No. 747 EDA 2025

Appeal from the Decree Entered March 4, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000228-2024

BEFORE:  STABILE, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                    **FILED JULY 14, 2025**

M.B. (Mother) appeals from the decrees granting petitions filed by the Philadelphia Department of Human Services (DHS) and involuntarily terminating Mother's parental rights to A.R. and N.B., daughters born in October 2019 and May 2022, respectively (collectively, Children);[1] and the orders changing Children's permanency goals from reunification to adoption. After careful review, we affirm the decrees and orders.

The family came to DHS's attention in 2019 following a report that Mother used illicit drugs during her pregnancy with A.R.  N.T., 3/4/25, at 35. At birth, A.R. suffered symptoms of drug withdrawal.  *Id.* at 36.  In 2021, DHS received a report alleging that law enforcement discovered Mother

_____

[1] The juvenile court also involuntarily terminated the parental rights of 1) D.R., A.R.'s biological father; 2) W.R., N.B.'s biological father; and 3) any unknown putative fathers.  None are parties to the instant appeal.

"passed out" in a stairwell next to A.R., leaving A.R. unattended in a nearby stroller. *Id.* at 8.

Following a shelter care hearing on July 23, 2021, the juvenile court transferred legal custody of A.R. to DHS, directed that A.R. be placed in foster care, and permitted Mother weekly visitation supervised by the Community Umbrella Agency (CUA). On August 20, 2021, the juvenile court adjudicated A.R. dependent, returned physical custody of A.R. to Mother, and placed Mother under court supervision. The juvenile court additionally directed Mother to provide CUA with documentation and drug screens from Interim House,[2] and referred Mother for parenting classes, domestic violence counseling, and housing and employment assistance.

Mother failed to make progress toward her parenting goals, and, on March 28, 2022, the juvenile court returned physical custody of A.R. to DHS. The juvenile court referred Mother to the Clinical Evaluation Unit (CEU) for a dual diagnosis mental health/drug and alcohol assessment. The juvenile court further directed Mother to submit to drug tests at CEU and to participate in domestic violence counseling.

In 2022, following N.B.'s birth, DHS learned that (1) Mother was homeless; (2) Mother tested positive for opioids and benzodiazepines

---

[2] Interim House is a Philadelphia-based nonprofit agency that provides services to women with substance abuse and mental health issues. *See* INTERIM HOUSE, https://interimhouse.phmc.org (last visited June 18, 2025).

following N.B.'s delivery; and (3) N.B. suffered symptoms of drug withdrawal after birth. DHS obtained an order of protective custody of N.B. on June 14, 2022. On September 9, 2022, the juvenile court adjudicated N.B. dependent, and transferred legal and physical custody of N.B. to DHS.[3] The juvenile court referred Mother to CEU for drug screening and monitoring, and the Achieving Reunification Center (ARC) for appropriate services. The juvenile court permitted Mother supervised visits with N.B.

The juvenile court held numerous permanency review hearings, and consistently found Mother had made either moderate or minimal progress toward alleviating the circumstances necessitating Children's placement. On June 27, 2024, DHS contemporaneously filed substantially similar petitions to involuntarily terminate Mother's parental rights (TPR petitions) to Children, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b); and petitions to change Children's permanency goals from reunification to adoption. In its TPR petitions, DHS alleged that Mother "is not a viable permanency option for [Children], as [Mother] has failed to fully alleviate the circumstances which led to [C]hildren's placement." TPR Petitions, 6/27/24, Exhibit A (Statement of Facts), ¶ ccc.

Following several continuances, the matter proceeded to a contested goal change/TPR hearing on March 4, 2025. Mother appeared, represented

_____

[3] N.B. has never resided with Mother. N.T., 3/4/25, at 24.

by counsel. Children did not appear. Harry Levin, Esquire, served as Children's guardian *ad litem* (GAL), and Claire Leotta, Esquire, acted as Children's legal counsel (legal counsel). DHS presented the testimony of, *inter alia*, CUA case manager Ashley Wolfe (Ms. Wolfe). Mother testified on her own behalf.

Ms. Wolfe testified that she was assigned to work with the family in 2021. N.T., 3/4/25, at 7-8. Ms. Wolfe explained that Mother was given the following single case plan (SCP) objectives at the outset of the case: (1) attend regular visits with Children; (2) participate in mental health/drug and alcohol treatment; (3) attend parenting classes; (4) submit to drug screens; (5) participate in domestic violence counseling; and (6) participate in employment and housing workshops. *Id.* at 9. Ms. Wolfe opined that, throughout the life of the case, Mother's compliance with her SCP objectives was "[m]inimal." *Id.* at 22.

Ms. Wolfe testified that Mother was directed to complete parenting, housing and employment programs through ARC, but failed to do so until after DHS filed its goal change/TPR petitions. *Id.* at 9. According to Ms. Wolfe, Mother did not complete domestic violence counseling, and did not provide DHS with documentation concerning her employment or housing status. *Id.* at 10-11.

Ms. Wolfe testified that Mother told CUA that she was renting a room from her boyfriend's family, and permitted CUA to conduct a home

assessment. *Id.* at 10-11. Ms. Wolfe explained that CUA advised Mother that the home was unsuitable for Children based on "structural issues" and extensive clutter, and explained to Mother what documentation she would need to provide to establish that the home was "a long-term resource" for Mother and Children. *Id.* at 11; *see also id.* at 41 (Ms. Wolfe testifying that the home had a "hole" in an unspecified location). Ms. Wolfe testified that Mother did not provide the requested documentation or permit a second home assessment. *Id.* at 11, 41.

Regarding Mother's drug and alcohol treatment, Ms. Wolfe testified that Mother has been attending The Consortium, a drug rehabilitation center, "off and on since 2010[,]" where she receives "daily methadone maintenance[.]" *Id.* at 11. Ms. Wolfe testified that Mother's compliance with drug and alcohol treatment has "fluctuated throughout the life of the case, from minimally compliant to noncompliant to showing more motivation in her recovery." *Id.* at 13. Ms. Wolfe agreed that "drugs and alcohol continue[] to be an issue for [Mother.]" *Id.* at 14. According to Ms. Wolfe, Mother failed to consistently report to CEU for drug screens throughout the life of the case, and had not reported for a CEU drug screen since March 6, 2023. *Id.* at 17-18.[4] Ms. Wolfe

_____

[4] On Mother's motion, the juvenile court admitted negative drug screens from The Consortium, dated August 2023, and January, February, March, April, and July 2024. *See* Mother's Exhibit 3. Ms. Wolfe testified that Mother provided CUA with The Consortium's drug screens on an unspecified date. *See* N.T., 3/4/25, at 47.

testified that when she asked Mother why Mother failed to attend drug screens at CEU since 2023, "[Mother] was not able to provide a reason." *Id.* at 19.

Ms. Wolfe testified that Mother's visits with Children were supervised by CUA until November 2024. *Id.* at 14. According to Ms. Wolfe, Mother's visits were moved to a DHS facility "following a supervised visit at [CUA] where [Mother] became upset with [a] security guard over an issue with [Mother's] boyfriend's car …, and [Mother] assaulted the security guard." *Id.* Ms. Wolfe testified that Mother visits Children consistently, but has never progressed to unsupervised visits. *Id.* at 15.

Although Children's relationship with Mother "is primarily positive[,]" Ms. Wolfe testified that Mother's role in Children's lives "exemplifies more of a child-aunt[] relationship." *Id.* at 22, 24. Ms. Wolfe explained that A.R. "recently [] disclosed some frustration with [M]other and [A.R.'s] feelings regarding reunification and [her] relationship[ with Mother]." *Id.* at 22-23; *see also id.* at 23 (Ms. Wolfe testifying that A.R. advised her that "while she enjoys visiting with [M]other, sometimes [A.R.] would not wish to be reunified[ with Mother]."). Ms. Wolfe opined that Children would not "suffer irreparable harm if [Mother's] parental rights were to be terminated[.]" *Id.* at 24-25; *see also id.* at 23-24, 25 (Ms. Wolfe confirming that Children do not express a desire to see Mother).

Ms. Wolfe testified that, since December 2023, Children have resided in the same foster home with foster mother[5] and foster mother's minor son and adult daughter. *Id.* at 32-33. Ms. Wolfe testified that Children and foster mother "have a very close relationship, and it exemplifies a parent-child relationship." *Id.* at 33. According to Ms. Wolfe, Children and foster mother are bonded, and Children look to foster mother to meet their basic needs and provide "love, support, care, and comfort[.]" *Id.* Ms. Wolfe opined that Children would suffer irreparable harm if they were removed from foster mother's care "[d]ue to the close relationship that [Children] developed in [foster mother's] home and the connections that [Children have] established[.]" *Id.* at 34-35; *see also id.* at 35 (Ms. Wolfe confirming her belief that it is in Children's best interest to be adopted by foster mother).

Mother largely denied DHS's claims that she failed to satisfy her SCP objectives. *See id.* at 55-64. Mother claimed that her home was appropriate for Children, and maintained that CUA had not requested that Mother provide documentation establishing her right to reside in the home. *Id.* at 55-56. Mother further claimed that Ms. Wolfe lied when she testified that Mother refused to permit a second home assessment. *Id.* at 57. Mother testified that she had recently obtained employment, but did not have supporting documentation. *Id.* at 58. Mother admitted that she did not complete

_____

[5] Foster mother is a preadoptive resource. N.T., 3/4/25, at 32.

domestic violence counseling, but claimed she was unable to do so due to scheduling conflicts. *Id.* at 60. With the exception of domestic violence counseling, Mother asserted that she had completed every SCP objective necessary for reunification with Children. *Id.* at 63-64.

After the close of evidence, the GAL reported his position to the juvenile court:

> While I'm in agreement with [DHS], I'll just reiterate that this case has been going on for 35 months. There's been [] testimony from Ms. Wolfe that there was … minimal compliance [from] Mother[ regarding completing her SCP objectives], and that [A.R.] does not want reunification. The testimony also [established] … there was no parental bond between [C]hildren[ and Mother]. At the end of visits, [A.R.] does not ask about Mother …. [C]hildren are happy in their foster home. [Mother's v]isits never progressed beyond supervised visits. There would be … no harm to [C]hildren if [Mother's] parental rights are terminated, and it's in the best interest of [C]hildren to terminate [Mother's] parental rights.

*Id.* at 77-78 (paragraph breaks omitted); *see also id.* at 78-79 (legal counsel stating that A.R. "did not understand the concept of adoption, but … [A.R.] would like to stay in the home that she's in"; and that N.B., at two years old, was unable to articulate "what her desired outcome would be ….").

At the conclusion of the goal change/TPR hearing, the juvenile court terminated Mother's parental rights to Children, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed notices of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements.[6] The juvenile

---

[6] This Court *sua sponte* consolidated Mother's appeals.

court filed a statement in lieu of a Rule 1925(a) opinion, directing this Court

to the rationale it set forth at the conclusion of the goal change/TPR hearing.

Mother raises the following two issues:

1. Whether the [juvenile] court committed reversible error[] when it involuntarily terminated [M]other's parental rights[,] where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)[?]

2. Whether the [juvenile] court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical, and emotional needs of [C]hildren[,] as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)[?]

Mother's Brief at 8.

We review the termination of parental rights for an abuse of discretion.

*See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard

requires appellate courts to

accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*,

- 10 -

9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)); *see also In re Adoption of C.P.D.*, 324 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of … her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the

trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of C.S.*, 327 A.3d 222, 237 (Pa. Super. 2024) (quoting *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*)).  Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we address Section 2511(a)(1), which provides:

> **(a) General rule--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Concerning Section 2511(a)(1), Mother argues that the testimony at the goal change/TPR hearing established that Mother "did not demonstrate a settled purpose of relinquishing her parental rights to [Children]":

> To the contrary[,] the testimony … established that [M]other had essentially completed her [SCP] objectives.  More specifically[,] [Mother] completed parenting, housing and employment [workshops] at ARC.  [Mother] recently obtained housing ….  In addition, at the time of the [goal change/TPR] hearing[, M]other had once again gained employment.
>
> With regard to the drug and alcohol component of her [SCP] objectives[, M]other has been compliant with [The] Consortium []

- 12 -

for several years.  Moreover[, M]other was never recommended for inpatient services[,] and her drug screens were negative.

With regard to visits, … [M]other was consistent and the visits were of a quality nature.  Technically[,] the only outstanding objective was domestic violence [treatment,] as it was reported [Mother] was previously victimized[;] however[,] domestic violence was being addressed at [T]he Consortium thr[ough] therapy.

Mother's Brief at 16 (record citations omitted).

To satisfy Section 2511(a)(1), the petitioner "must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Adoption of B.G.S.*, 245 A.3d 700, 706-07 (Pa. Super. 2021) (citation omitted); *see also In re Adoption of C.M.*, 255 A.3d 343, 364 n.12 (Pa. 2021) ("[Section 2511(a)(1)] does not require a settled purpose of relinquishing parental claim **and** refusal or failure to perform parental duties, but one or the other." (citation omitted; emphasis in original)).

We have explained that in applying Section 2511(a)(1),

[t]he court should consider the entire background of the case and not simply … mechanically apply the six-month statutory provision.  The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of h[er] parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re Adoption of A.C.*, 162 A.3d 1123, 1129 (Pa. Super. 2017) (citations and paragraph break omitted).  However, the General Assembly's emphasis

on the six months immediately preceding the filing of the petition indicates the timeframe is the "most critical period for evaluation" of a parent's conduct. ***In re Adoption of L.A.K.***, 265 A.3d 580, 592 (Pa. 2021).

Regarding the definition of "parental duties," our Supreme Court has explained:

> Our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert [her]self to take and maintain a place of importance in a child's life. Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

***Id.*** (citations, some quotation marks, and brackets omitted).

Instantly, the juvenile court rejected Mother's argument that DHS failed to establish, by clear and convincing evidence, that termination was warranted pursuant to Section 2511(a):

> It is not lost on the [juvenile c]ourt that substance use issues are not easily overcome. So I first want to commend you, [Mother], on having the clean [drug] screens. And the [juvenile c]ourt appreciates that you're continuing to undergo treatment and hoping that you're able to discontinue the need for methadone treatment.
>
> The record reflects that [A.R.] was initially placed pursuant to an order of protective custody on July 21, 2021; and that [N.B.] was placed pursuant to an order of protective custody on July 14, 2022. Although [A.R.] was briefly reunited with Mother, she was placed … in March of 2023. [C]hildren [have] remain[ed] together in [foster mother's] home since December of 2023.

[SCP] objectives were established for … Mother[.] While I do not find that Mother was minimally compliant, she has not been fully compliant with [SCP] objectives, nor [has she] made sufficient progress to alleviate the need for placement. The testimony reflects that while Mother pretty consistently visited[ Children], the visits remain supervised at DHS, and they have never progressed beyond supervised.

N.T., 3/4/24, at 82-84 (some paragraph breaks omitted).

The juvenile court's factual findings are supported by the record and its conclusion is free of legal error. *See Interest of K.T.*, 324 A.3d at 56 (stating that "an appellate court must … defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion." (citation omitted)). Upon review, we agree with the juvenile court that Mother has failed to make "sufficient progress to alleviate the need for [Children's] placement." N.T., 3/4/24, at 83. The record belies Mother's claim that she satisfactorily completed the majority of her SCP objectives. Ms. Wolfe testified that Mother did not (1) secure housing appropriate for Children; (2) regularly submit to court-ordered drug screens at CEU; (3) provide proof of employment; (4) complete domestic violence counseling; or (5) progress beyond supervised visits with Children. *See* N.T., 3/4/24, at 10, 11, 15, 17-18. The juvenile court properly exercised its discretion in crediting the testimony of Ms. Wolfe, and determining that DHS met its burden of establishing that termination was

warranted pursuant to Section 2511(a)(1). *See In re Adoption of C.P.D.*, 324 A.3d at 24. Accordingly, Mother's first issue merits no relief.[7]

Mother next challenges termination under Section 2511(b). Mother's Brief at 19. Mother argues that "[b]ased upon the overwhelming level of compliance by [M]other with her SCP objectives and her positive relationship with [C]hildren, the [juvenile] court erred in terminating [Mother's] parental rights …." *Id.* at 20-21.

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. ….

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Int. of K.T.*, 296 A.3d at 1105. Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.*

---

[7] Because we agree with the juvenile court that DHS met its burden with respect to Section 2511(a)(1), we need not address Mother's claims that termination was inappropriate pursuant to Section 2511(a)(2), (5), and (8). *See Int. of M.E.*, 283 A.3d at 830.

(citation omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted); *see also In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) (stating that "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.").

Here, the juvenile court explained as follows, concerning Section 2511(b):

> While [C]hildren enjoy visits[ with Mother], enjoying visitation is not enough to, at this point, continue to seek reunification. [C]hildren have been in foster care for years, and the circumstances that led to placement have not been alleviated.
>
> [C]hildren do not look to [Mother] to meet their needs[,] but look to [foster mother] to meet their needs. I find that termination would not cause [C]hildren irreparable harm. [C]hildren deserve permanency. I find that the termination of [Mother's] parental rights will not destroy a necessary [and] beneficial relationship[,] because those needs are being m[et] by the [foster mother].
>
> ….
>
> [C]hildren deserve permanency, and I find it's in their best interest for the parental rights of [Mother] to be terminated ….

N.T., 3/4/24, at 83-84 (some paragraph breaks omitted).

- 17 -

We agree with the reasoning and conclusion of the juvenile court, as it is supported by the record and free of legal error. On the date of the goal change/TPR hearing, Children had been in foster care for nearly three years. During that time, Children developed a parent-child bond with foster mother, to whom they look for "love, support, care, and comfort." N.T., 3/4/25, at 33. As we have previously observed, a "court cannot and will not subordinate indefinitely a child's need for permanence and stability to the parent's claim to progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Accordingly, Mother's final claim merits no relief.[8]

Decrees and orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/14/2025

---

[8] Mother abandoned on appeal her challenge to the juvenile court's orders changing Children's permanency goals from reunification to adoption. However, even if preserved, her issue would be moot. *See Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (holding a parent's challenge to a child's permanency goal change was moot after this Court affirmed the trial court's termination decrees).